#4
no related
M/IFP
15JF

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
CIVIL DIVISION

DARAYA MARSHALL,
        Plaintiff

        v.

GEO RIVERS CORRECTIONAL INSTI-
TUTION (previously located in
Winton, NC 27986) STAFF:
    Administrator: BRICK TRIPP; Records:
    Mr. HINTON; Counselor: Ms. SPRUILL;
    Counselor: Ms. LASSITER; Case Mana-
    ger: Mr. JOYNER; Case Manager: Mrs.
    BURKETT; RHU Supervisor: Lt. HUDSON;
    R&D Officer: Mr. SMALLWOOD; R&D Of-
    ficer: Mr. HUNTER; [Unknown Female
    Case Management Coordinator]; [Un-
    known Female Administrative Secre-
    tary]; Officer LANGFORD; GEO Eastern
    Region Staff; RHU Sgt. HANNON;:
BUREAU OF PRISONS (BOP) Staff:
    Mr. ESPINOZA, Overseer of RCI; Ad-
    ministrative Remedy Coordinator (DC,
    2020): [Name Illegible]; Acting War-
    den S. BARLETT (FCI Loretto); Assoc.
    Warden BRAWLEY (FCI Loretto); Admin-
    istrative Remedy Coordinator (FCI
    Loretto): [Name Illegible]; Adminis-
    trative Remedy Coordinator (North-
    east Region): [Name Illegible]; Ad-
    ministrative Remedy Coordinator

BIVENS & Tort Claim [enjoined]

Case no. 3:22-cv-227

***JURY TRIAL DEMANDED***

RECEIVED

DEC 05 2022

CLERK, U.S. DISTRICT COURT
FOR THE WESTERN DISTRICT
OF PENNSYLVANIA

i

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
CIVIL DIVISION

| | |
|---|---|
| (Central Office): [Name Illegible]; Northeast Regional Counsel: DARRIN HOWARD; General Counsel (Tort Claim Division, 320 First Street NW, Washington, D.C, as of March 2021): [Name Unknown]; Administrative Remedy Coordinator (Privatization MGMT Branch, 2021): [Name Illegible]; | BIVENS & Tort Claim [enjoined] <br><br> Case no. **3:22- cv-227** <br><br> ***JURY TRIAL DEMANDED*** |

VERIFIED COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

This suit arises from violations of the First, Fifth, Eighth, and Fourteenth Amendments, concerning 1) neglect of welfare; 2) neglect of medical needs; 3) denial of access to courts and legal material concerning: a) Plaintiff's civil suit in Prince Edward's County, VA; b) 18 USC §2255 claim in re: criminal case in Washington, D.C.; c) petition for compassionate release from November 2020 to April 2021; 4) denial of access to material with which to petition a) Congress; b) District Attorney's Office "Integrity Board"; c) Department of Justice "Office of Professional Conduct"; 5) denial of administrative remedy concerning all of the issues raised within this suit; 6) freedom of expression; 7) legal communication; 8) procedural due process violations; 9) equal protection, and 10) mental & emotional abuse.

Plaintiff is initially seeking 1) a Motion for Compassionate Release/ Reduction in Sentence from the Bureau of Prisons (BOP), and 2) supporting letters and/or petitions for the Motion from all those liable, as well as 3) compensatory

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
CIVIL DIVISION

| Case Manager: Mr. WATT; Warden: Ms. V. MOSER | BIVENS & Tort Claim [enjoined]<br><br>Case no. 3:22-cv-227<br><br>***JURY TRIAL DEMANDED*** |
|---|---|

damages amounting to $25,000 lost from the Tort Claim mentioned within due to denial of access to the courts. If this initial settlement is not granted, or is ignored by the Defendants, then Plaintiff will be seeking compensatory damages in addition to nominal damages, punitive damages, injunctive relief, and declatory relief, as well as anything else that can be reasonably awarded within this claim.

Due to the magnitude of this case, Plaintiff is hereby requesting court-appointed counsel to assist in this matter, to ensure compliance with local court rules, laws, and for making correct and reasonable requests for relief. Prior to the appointment of counsel, the Plaintiff is proceeding pro se. The Plaintiff is proceeding in forma pauperis.

Plaintiff is suing all individuals in their individual and professional capacity. If any liable party is not specifically mentioned in the header but is deemed liable within the text, the Plaintiff reserves the right to enjoin them in the suit.

On or about August 26, 2020, while at Rivers Correctional Institution ("RCI"),
the Plaintiff Daraya Marshall ("MARSHALL") was placed in the Restricted Housing
Unit (RHU) until being transferred on February 16, 2021. The first day in
the RHU, medical staff informed the day shift staff at RCI that MARSHALL
needed power for his CPAP machine. MARSHALL immediately informed both day
and evening shift staff, specifically the two officers that placed MARSHALL
in the cell and the evening Shift Sergeant [name unknown; correctional records
should reflect] about the need for power for his CPAP, and that the shower
in his cell was not working.

During this period (August 26, 2020 to February 16, 2021), MARSHALL was locked
in a cell for roughly 26 days with an inoperable shower, no electricity for
his CPAP machine, and no knowledge of why he was even placed in the RHU to
begin with. For the first few days he was not even given his prescription
glasses, because the abovementioned Sergeant refused to give MARSHALL his
property. Another officer acknowledged he was being treated unfairly, and
took it upon himself to locate the glasses. MARSHALL was also restricted from
purchasing commissary items that similarly situated inmates in the RHU were
allowed to have, and was placed on phone restriction (going from 35 calls
per month down to 5 calls per month)—without receiving a Disciplinary Re-
port or hearing that warranted such action. During this time, MARSHALL made
several verbal complaints to various staff, and wrote an Informal Resolution
Request, which is the first action in the Administrative Remedy process after
verbally attempting to resolve the issues.

Nothing was done about any of the issues until after MARSHALL attempted to

1

speak with the Auditor [name unknown] who came to inspect the facility on September 21, 2020, whom they would not allow MARSHALL to speak with. Instead, he was forced to speak with a woman who said she was the Outside Coordinator. Finally, they fixed the shower and power, as well as at last mentioned the alleged reason for placing MARSHALL in the RHU. It was explained that while no Disciplinary Action would be taken, there would be no release from the RHU, laying the groundwork for other forms of abuse to continue, as is outlined below.

On September 21, 2020, after clothing was sent to the Laundry department to be washed, MARSHALL did not receive his clothing back. Officer Langford ("LANGFORD"), who was passing the clothing back to the inmates, was informed. LANGFORD instructed MARSHALL to fill out a Request to Staff form for the clothing to be replaced. The Request to Staff was completed and given to LANG-FORD. On September 22, 2020, MARSHALL asked the RHU Supervisor, Lieutennant Hudson ("HUDSON") if she had seen the request. HUDSON replied that she had. No clothing was received, however, and MARSHALL continued his grievance process by now filing a Step 1 Administrative Remedy Form concerning all the abuse and neglect.

The Administrator, Mr. Brick Tripp ("TRIPP") responded on October 22, 2020 by saying he was told that all issues were resolved. MARSHALL then spoke with several Sergeants in an attempt to prove that he was being truthful, asking them to search his cell to show that he did not have proper clothing, and had a receipt that showed he was denied items from commissary that other RHU inmates were allowed. It was not until November 1, 2020 that MARSHALL

was able to get Sergeant White ("WHITE") and Officer Baker ("BAKER") to con-

duct a cell search to prove that TRIPP was lied to, and that if TRIPP had

done his job by investigating the matter himself instead of relying on the

words of the same individuals whom were the reason for the grievance being

filed then he would have discovered the same. As such, TRIPP was neglectful

of his duties, and rendered the entire grievance process to be of no use.

WHITE signed a Request Form as documented proof. It is also documented by

medical staff within MARSHALL's medical records that MARSHALL obtained bac-

terial infections on his penis and testicles from having to wear the same

soiled clothes for over 30 days.

After finally being able to secure proof—the Request Form signed by WHITE—

MARSHALL was further hindered in his attempt to get copies of the paperwork

to attach to the Step 2 Administrative Remedy Form that now needed to be sent

to the Eastern Region branch of GEO. MARSHALL spoke with A-Unit Counselor

Lassiter ("LASSITER") twice concerning obtaining copies; LASSITER replied

by saying she didn't have time to make copies, and to instead ask RHU staff.

A-Unit Counselor Spruill ("SPRUILL") at this time was not coming to the RHU

as she should have been. MARSHALL attempted to ask several Security Staff

as LASSITER instructed. He asked Lieutennant Bottoms ("BOTTOMS") and WHITE,

who said that a Counselor must do that, not Security. He also asked RHU Of-

ficers SMALLWOOD and DOBAY, who told him to talk to HUDSON, the RHU Super-

visor.

Let the Court note that HUDSON is the RHU Supervisor who told TRIPP that all

issues were resolved. Because of the position HUDSON holds, any grievance

about the RHU comes back on her—a conflict of interest—therefore it is against policy to force MARSHALL to seek help from a person who is partially the cause of the grievance, and can easily hinder the process to serve themself. It is also against policy for any Security Staff to handle such matters, period. It is the job of the Counselors, Case Managers, and/or other Administrative Staff. MARSHALL was placed in a situation that he should not have been by being forced to ask HUDSON for assistance. Indeed, out of fear of not getting the paperwork back and/or facing harsh retaliation, MARSHALL felt he had to redact some of the complaint.

Initially, HUDSON said she didn't have time. The following week she was in training, and MARSHALL attempted to ask Sgt./Lt. Martinez ("MARTINEZ") and another female Sergeant that was on duty temporarily in the RHU in for HUD-SON the week of November 9-13, 2020. MARSHALL was finally able to secure copies that afternoon when HUDSON came in briefly, but still had no choice but to place the copies in the hands of the same RHU staff to be mailed to the GEO Eastern Region office. Although the Eastern Region is headquartered within the same state, the documents did not reach their office until 8 days later. One has no choice but to assume that it was deliberately being held up.

A few days after sending the Step 2 Administrative Remedy, all of MARSHALL's property was taken away from him on November 17, 2020, under the guise of MARSHALL supposedly being transferred on November 19, 2020. On the morning of the 19th, the Transport Officers informed MARSHALL that he was not on their list, and they didn't know anything about him. A witness to this was RHU Officer Mitchell ("MITCHELL"), and another RHU officer whose name is unknown (GEO roster and/or assignment list will show who the other officer was who

was working at that time on November 19, 2020 between 3am and 6am), as well
as the Transport Officers on duty. RHU camera footage would have also docu-
mented this and other dates/events mentioned within this Complaint. If the
Defendants wish to dispute any of this, MARSHALL pleas with the Court to com-
pel the Defendants to bring forth all relevant ledgers and camera footage
in connection with all times and dates mentioned, and to provide the full
name of all staff involved.

Immediately on November 19, 2020, MARSHALL began to make oral complaints in
an attempt to resolve the issues as instructed by GEO Handbook, p. 11, "Ad-
ministrative Remedy Process".

MARSHALL spoke with Bureau of Prisons staff member Mr. Espinoza ("ESPINOZA"),
who was an overseer of Rivers Correctional Institution. He also spoke with
LASSITER and HUDSON. He told each of them that he felt he was being retali-
ated against, as per GEO Handbook p. 1, which states retaliation for exer-
cising an individual's right to Administrative Remedy proceedings is against
GEO policy.

More importantly, MARSHALL explained that he had a $25,000 civil Tort Claim
in court, regarding which he received a Motion on November 16, 2020 that the
defendants filed in an attempt to have the case dismissed, but since his pro-
perty was taken on November 17, 2020, MARSHALL never had the opportunity to
respond to this Motion. So he asked that his property be returned if he was
not going anywhere soon, so that he could respond to the Motion—because if
he did not, the case would be dismissed, and the $25,000 claim would be for-
feit.

MARSHALL also asked LASSITER if he could get something in writing from her to explain to the court what was going on. She said that she would, but MAR-SHALL never received anything—even after speaking to LASSITER several times after that.

MARSHALL also explained to all of the staff he interacted with that he had 1) a deadline to file his §2255 Ineffective Assistance of Counsel Motion in his criminal case, and 2) he had a §3582 Motion for Compassionate Release that was in progress which he needed to take the next step in, as well as 3) a complaint to the Office of the Attorney General's Integrity Board that he needed to finish, 4) a complaint to the Department of Justice that he needed to work on, and 5) a petition to Congress that needed to be done. On November 20, 2020 he spoke to A-Unit Case Manager Joyner ("JOYNER") about the same. A-Unit Case Manager Ashe ("ASHE") was not coming to the RHU as she should have been, so he couldn't speak with her about this. He nonetheless spoke with several staff about not having his hygiene products and shower shoes—which forced him to have to stand on his boxer shorts while taking a shower for the next few months to keep from standing directly on the dirty shower floor. This went on for the next few months until he was transferred. He was forced to buy new products that, due to his financial state, he could surely not afford, especially since he would have to leave those products behind because they refused to pack it with the property already taken when he finally did transfer. To have to purchase new items caused a loss, but a bigger loss occurred when he had to leave them all behind. He was denied access to his address book and phone numbers, which deprived him of communication with some friends and family even to the point of not being able to do simple, yet important

6

things like send out birthday and holiday cards. Fammily communications is one of the major factors that Case Managers grade inmates on, so to deprive a person is to once again violate policy and rights. MARSHALL was denied access to letters, pictures, radio, books, and other things in his property that could have helped him cope with the environment. To not have these things along with all else that was being done to him only added to the trauma. He was being emotionally and mentally scarred. He began to have unhealthy thoughts. The correctional staff were fully aware of the rammification of inmates not having material with which to cope with idleness, which is why they provide things such as radios, MP3 players, &c.

In an attempt to once again stop the actions against him and resolve the issues of property and access to the course, MARSHALL on November 25, 2020 sent 4 Informal Resolution forms to A-Unit Counselors SPRUILL and LASSITER. On November 27, 2020 he informed LASSITER that he sent the Informal Resolution forms through Internal Mail. On December 8, 2020, LASSITER informed MARSHALL that SPRUILL did have the Informal Resolutions. Within the Informal Resolution he asked SPRUILL and/or LASSITER to contact the courts and let the courts know what was going on in regards to his property, and he explained to her that if he does not get his property back so that he can answer the motion, or if she will not at least contact the court, the liability of the Tort Claim will fall upon GEO and all staff involved. Also addressed were the issues mentioned above and the fact that his mail was being handled improperly, which caused his mail to take longer to go out and get to him. His Step 2 Administrative Remedy took 8 days to reach the Region, when it should have only taken 2-3 days. MARSHALL was also given mail by Officer Mabine ("MABINE") on Saturday,

7

when mail doesn't even run in RCI on Saturdays. When MARSHALL asked MABINE about this, MABINE stated it had been sitting in the Control Bubble for a couple of days. Even after filing the Informals, a holiday card sent by MAR-SHALL's grandmother was postmarked 30 days prior to it being received by him, and newspapers that MARSHALL had previously received every Monday was now coming that Friday or the following Monday. It was also discovered later that the Compassionate Release Motion sent to the court and the letter requesting an extension for his criminal case never actually reached the courts.

On December 14, 2020, MARSHALL asked LASSITER to inform SPRUILL that he needed an answer to his Informal Resolution request so he may move on to a Step 1 Administrative Remedy, which is the next step in the grievance process.

On December 17, 2020, during a Team meeting with SPRUILL and Case Manager Burkett ("BURKETT"), MARSHALL was told by SPRUILL that she had shredded the Informal Resolutions because they had been sent through the Internal Mail system, and she could not be sure that it was MARSHALL who wrote them. Let it be noted that LASSITER informed SPRUILL that MARSHALL had indeed wrote them, and later had followed up looking for a reply. MARSHALL spoke to LAS-SITER three times about this. Also, because SPRUILL was not doing her rounds in the RHU at that time—as is required—MARSHALL's only access to her was in fact through the Internal Mail system, which is what the system was de-signed for—and Rivers Correctional Handbook instructs inmates to use the Internal Mail system to reach staff when they are unable to communicate with them in person for any reason.

To make matters worse, on December 8, 2020, when MARSHALL gave BURKETT a Request Form asking her to confirm that SPRUILL said she shredded the Informal Resolutions, the Request Form came back from BURKETT (through Internal Mail) stating that SPRUILL mysteriously found the Informals she had supposedly shredded, and she was going to send them back, which she did—unanswered—through Internal Mail. Not only did she lie by saying she did not know if MARSHALL sent them—even after it was confirmed by LASSITER-more than once—but then she lied about shredding them after MARSHALL verified to her in person that he sent them. Then, after all that, she sent them back through the same Internal Mail system and told MARSHALL that he had to do them all over again. This was unbelievably unprofessional of her, and one has no choice but to believe she was intentionally trying to hinder his grievance process. He also explained to her that he was in a time-sensitive situation with the courts, about which it is obvious that she did not care at all.

On December 29, 2020, after having to wait several days for a Unit Team Member to come through the RHU, MARSHALL gave BURKETT the rewritten Informal Resolutions directly to give to SPRUILL. These were still concerning the property matter and her contacting the courts, as well as other issues mentioned. SPRUILL replied, stating that she spoke with R&D Officer Hunter ("HUNTER"), and RHU Supervisor HUDSON concerning the property. Afterward, HUDSON said she spoke with R&D as well. MARSHALL had no way of verifying this, but his property was nevertheless still not returned. What is sure is what SPRUILL did not do, which was go beyond simply asking an R&D officer (i.e. HUNTER), instead of speaking with a supervisor when the problem was clearly not resolved.

Also, SPRUILL did not contact the courts, nor did she address any of the other outstanding issues, all of which was well within her power. According to the Rivers Correctional Handbook, page 2, "[t]he Counselor is supposed to help with daily problems and personal difficulties, and the Case Managers are supposed to help as well.

On January 12, 2021, MARSHALL sent a Step 1 to Administrator TRIPP, addressing all of the same issues raised in the Informal Resolutions. MARSHALL also explained that liability will shift to TRIPP's staff, TRIPP himself, and the GEO Group corporation if MARSHALL did not get any assistance. There was no response.

On February 11, 2021, MARSHALL sent a Step 2 to the GEO Group Eastern Region. He restated the same, and explained the steps he took prior to sending the complaint to them. There was, again, no reply. Because MARSHALL suspected that either the mail addressed to the Eastern Region would be interfered with, or those at the Eastern Region may simply act as if they didn't receive it, or as if it was received too late, MARSHALL had the Sergeant on duty sign a Request Form stating that MARSHALL gave him the envelope addressed to the Eastern Region at that time. Also, a stamped envelope was placed within the parcel sent to the Eastern Region, so as to cover the mailing expenses in case MARSHALL actually was transferred to another facility before a response was available. In any case, there was no response sent, therefore making the person or persons who were put in place to handle such grievances neglectful— and liable—as well, because they are supposed to ensure that any issues are addressed and a proper remedy is provided.

Let it be noted that in light of the information that MARSHALL would be trans-
ferred, one of the requests MARSHALL asked for to compensate for some of the
actions against him was to be transferred to a facility that still operated
a UNICOR program, so that he may receive programming/work credits ("Produc-
tive Activities", or PAs), and be able to earn sufficient money to pay off
his fine and still take care of his personal needs, all of which were strip-
ped when he was placed in the RHU and lost his job in the commissary, which
provided a premium pay grade. It should be further noted that during senten-
cing, the Pre-Sentence Investigator mentions UNICOR in her report, in expec-
tation of MARSHALL being sent to a facility to accommodate that. Instead,
MARSHALL was transferred to a facility which officials knew that its UNICOR
plant had been shut down long ago, and is known to be a disciplinary low-
security institution. To lie to MARSHALL about UNICOR and send him to a place
that is known to be undesirable–as well as a facility that could not satisfy
the needs of MARSHALL has to be looked at as nothing else but a retaliatory
transfer, especially in light of the fact that almost 600 inmates from the
same facility had already been or were in the process of being sent to FCC
Petersburg, which has UNICOR, better programs, better/easier access for fam-
ilies to visit coming from Washington D.C., and better treatment from staff.

During the time leading up to the transfer, MARSHALL also sent a Motion for
Compassionate Release/Reduction in Sentence under §3582 due to the incidents
that had already occurred at that time, along with the threat of COVID-19
to his already perilous health. It was denied.

After exhausting all of the remedies provided within the GEO system, MARSHALL

sent the Complaint and the Appeal for the Request for Compassionate Release
on November 30, 2020 to the Administrative Remedy Coordinator of the Privati-
zation Branch of the Bureau of Prisons (BOP) in Washington, D.C. It was stam-
ped so as to indicate that the paperwork was not received until about 30 days
later, on December 30, 2020. A response was not documented until March 16,
2021. It was received at FCI Loretto on April 6, 2021. After over one hun-
dred days, the Administrative Remedy Coordinator (or whomever was assigned
the case) did not even address the issues—instead waiting until after MAR-
SHALL was transferred—then stated that MARSHALL needed to get his current
Warden and Region's response at his new institution, even though that War-
den and Regional Office had nothing to do with the actions of the staff at
RCI nor those of GEO Group's Eastern Region office. To respond in such a man-
ner and ignore the immediate issues makes the Administrative Remedy Coordinator
(or whomever was assigned MARSHALL's case) neglectful of their duties; as
such, they should be held liable for all that has happened as well. The ad-
ministrative remedy process should have been considered exhausted at this
point, but MARSHALL strove for compliance and did what was requested of him
by filing a Request for Compassionate Release/Reduction in sentence with the
Acting Warden of FCI Loretto, and with the Northeast Region, addressing not
only what all happened at Rivers Correctional, but what was going on at FCI
Loretto as well. The Acting Warden ignored the issues raised, and an elec-
tronic Inmate Request to Staff ("cop-out") to review the documents again was
sent by MARSHALL.

MARSHALL also sent a Tort Claim to the General Counsel, Tort Claim Division,

which sent the Tort Claim in turn to a Mr. Darrin Howard ("HOWARD"), in the
Northeast Region in Philadelphia. HOWARD stated that MARSHALL should send
the documents to RCI, even though Marshall provided copies of page 10 of
the RCI Inmate Handbook and documentation from RCI's Administrator TRIPP di-
recting that MARSHALL send all Tort Claims concerning RCI to the Office of
General Counsel of the Bureau of Prisons in Washington, D.C..MARSHALL asks
that the name of the person responsible within the Office of General Counsel
be provided, and that they be added to this suit for their neglect and indif-
ference.

After not receiving a response from the Acting Warden for the request to re-
view the documents,aand with no further instructions from Acting Warden Bar-
lett ("BARLETT") within his response, MARSHALL proceeded to the Northeast
Region.

The Northeast Region sent the documents back and requested that MARSHALL elicit
another response from BARLETT by filing a BP-9 (Administrative Remedy) form.

On May 18, 2022, MARSHALL received a BP-9 through Counselor Forlina ("FORLINA"),
and turned it back in on June 2, 2022. It was dated to have been received
and answered 6.days later on June 8, 2022. MARSHALLereceived it back by mail
on June 13, 2022 at about 3:45pm, but was instructed to respond back within
5 days of the June 8, 2022 date—yet he did not receive it until the fifth
day. MARSHALL immediately brought this to Unit Officer Glenn ("GLENN")'s at-
tention, and asked GLENN to signeit, verifying that MARSHALL had just received
it from him. GLENN stated that MARSHALL was not the only one with the same

13

issue, and mentioned two other inmates that had received responses at that time saying the same. GLENN also stated that he could not sign it for MAR-SHALL. Since GLENN was the staff member who gave MARSHALL the document, MAR-SHALL is unaware of any policy that would prevent GLENN from verifying that he received it from him on that date, especially in light of the fact that there were no administrative staff available to MARSHALL at that time.

Since there was no administrative staff available at the time, MARSHALL im-mediately spoke with FORLINA the next morning (June 14, 2022). FORLINA in-structed MARSHALL to talk with the administrative staff during mainline about 1) the timeline; 2) the fact that MARSHALL could not go back to an Informal Resolution request (BP-8) after BARLETT's response, and 3) there are many factors in a Compassionate Release/Reduction in Sentence motion, and it is not limited to one issue or one continuation page/exhibit.

During the noon meal, MARSHALL spoke with Assistant Warden Brawley ("BRAWLEY") who instructed him to go ahead and file his response. Due to the fact that FOR-LINA's "open house" hours (8:00-8:30am) were over, MARSHALL had to wait un-til 8am the next day (June 15, 2022) to get another BP-9. After filling out the BP-9, MARSHALL had to wait again until 8am the following day (June 16, 2022) to turn it in to FORLINA. (This is another example of the oppressive nature of these institutions; out of the entire day, inmates are only allowed that 30-minute window to meet with their Counselor. No matter how important an issue is that may come up after that time, one is unable to get any sort of assistance, and if an inmate has to go to work/school/commissary/&c... then he will have to miss these activities in order to see his Counselor).

The Administrative Remedy Coordinator [name illegible] stated that the afore-
mentioned BP-9 was received that day (June 16, 2022) and rejected on June
17, 2022—because MARSHALL did not answer in the 5 day window following the
June 8, 2022 date. As explained above, there was no possible way MARSHALL
could have done so, and since it normally only takes one day via Institutional
Mail for such documents to be delivered, it can be reasonably believed that
this inexplicable delay occurred deliberately to stop MARSHALL's process.


After receiving the new rejection, MARSHALL again spoke to BRAWLEY. He had
Unit Manager Fannin ("FANNIN") issue MARSHALL another BP-9, and instructed
MARSHALL to complete it again, attach BARLETT's initial response, remove the
other exhibits, and send him an email after MARSHALL turned it in again, so
that BRAWLEY could make sure it gets answered this time. Instead of being an-
swered properly, however, it was claimed to be untimely again.


The response from the Northeast Regional Office was "Concur with rationale
of Institution." Marshall then proceeded to the Central Office in Washington,
D.C., by filing a BP-11. The response to this was: 1), "You submitted your
request or appeal to the wrong level." This is untrue because MARSHALL im-
mediately sent an electronic request to Acting Warden BARLETT to revisit these
issues after the initial rejection from him. That should have been an exhaus-
tion at that level. After 30 days with no answer, MARSHALL sent an appeal
to the Northeast Region, but was instructed to send another request to the
Acting Warden of FCI Loretto to reconsider through a BP-9—which MARSHALL
did as soon as possible. Therefore, reason 1 is gravely incorrect. 2) "Con-
cur with rationale of Regional Office and/or Institution. Follow directions

15

provided on prior rejection notices." MARSHALL has done everything possible
to follow the directions of prior rejections, even though Counselor FORLINA,
Case Manager Watt ("WATT"), and Unit Manager FANNIN instructed MARSHALL that
said directions were incorrect. 3) "If staff provide a memo stating the late
filing was not your fault, then re-submit to the level of the original rejec-
tion."


After receiving this, MARSHALL then sent an electronic cop-out to AW BRAWLEY
explaining what was said, and that MARSHALL needed a memorandum addressing
the issue. BRAWLEY instructed MARSHALL to see him during the noon meal. As
instructed, MARSHALL did so, and re-explained the whole situation once again.
BRAWLEY responded by saying no one was going to write a memo admitting their
own wrongdoing. BRAWLEY stated that MARSHALL did not have to go through the
whole process to file for compassionate release/reduction in sentence. MARSHALL
proceeded to explain once again that he only asked for the compassionate release/
reduction in sentence and $25,000 tort claim as a remedy for the cruel and
unusual punishment he endured, COVID-19, and all else mentioned herein, and
that MARSHALL's intention was to file suit if this remedy could not be satis-
fied. Therefore, MARSHALL had to exhaust all remedies. BRAWLEY then stated
that there was nothing he or his staff could do concerning the tort, and that
MARSHALL couldn't win his claim of denial of access to the courts, nor some
of the other issues MARSHALL mentioned. MARSHALL understood that this is the
mentality of most BOP staff, but he knew he had to ask for the sake of exhaus-
ting all available avenues known to him to remedy the violations. At this time,
all available administrative remedies have been exhausted.

MARSHALL has contacted COVID-19 more than once since the pandemic began, due
largely to the fact that he cannot quarantine himself from the correctional
staff that in most cases are the ones bringing the virus into the institution.
Staff are not tested, and as such are almost certainly responsible for
each of the numerous outbreaks of COVID-19 the institution has endured
since the pandemic began. MARSHALL is also unable to quarantine from his
cellmates, who sleep less than six feet away from him—which means that
he is at risk of contracting the virus even in his sleep. Once the hundreds
of inmates with which MARSHALL has to share the water fountain, hot water
machine, toilets, showers, and countless other points of contact are taken
into consideration, it cannot be denied that MARSHALL will be <u>forced</u> to
contract ever-emerging variants of coronavirus year after year, and likely
more than once per year. Each time this happens, MARSHALL's life is on
the line, and even if he survives the initial infection years are still
being taken off of his lifespan with each new infection. The long-term
effects of the virus form the syndrome known as "long COVID", and can
be devastating. As of now, MARSHALL still feels the effects of having it.
Doing something as simple as laughing forces him into fits of coughing.
MARSHALL suffers headaches, fatigue, and tiredness throughout the day,
in addition to lack of concentration, and trouble remembering things such
as the name of his friend's child (whom MARSHALL has known for over ten
years).

To force MARSHALL to be exposed to and contract this deadly virus, and
suffer all else that comes with it for the rest of his term of incarceration
constitutes cruel and unusual punishment—an Eighth Amendment violation—that

was not and indeed could not have been factored in when he was being sentenced.

In regards to treatment, FCI Loretto offers nothing but Tylenol, and even that only if one complains enough. The commissary has not had cough syrup in stock for weeks during this past round of the virus; cough syrup being the only thing that is offered (for sale) that helps even a little. In the event of an outbreak of dangerous and deadly disease, Health Services should be providing medication to all afflicted inmates during times such as these.

MARSHALL is simply unable to take care of himself under these conditions. He cannot protect himself. He cannot do something as simple as buy orange juice from the grocery store, which would help more than anything he will receive at FCI Loretto.

Since being at FCI Loretto, MARSHALL has found himself in an abusive, demeaning atmosphere as far as the way staff members are allowed to talk to and treat inmates, in ways that flagrantly violate BOP policy and the Constitution.

MARSHALL has been denied proper medical treatment since day one. On February 2021, MARSHALL arrived at FCI Loretto. Immediately his CPAP machine was taken from him and has not been returned (as of November 2022). It has been documented that MARSHALL has stopped breathing over 20 times within a mere few hours of sleep. To go about 21 months without his CPAP machine equates to hundreds of days and nights of him not breathing, and almost certainly constitutes deliberate indifference on the part of the institution. Not breathing means a lack of oxygen to the brain, lungs, and other organs, which leads to other illnesses—and possibly death.

It should be known that some inmates were placed in the SHU because they de-
manded to be able to use their machines. This retaliatory informal policy
is typical of the endemic culture at FCI Loretto.

For over a year MARSHALL was denied proper medical treatment concerning his
blood pressure. It was documented several times that MARSHALL's pressure was
extremely high. In an attempt to place the blame on MARSHALL, he was ordered
to pill line at 6:00am every morning—supposedly to ensure medication com-
pliance. His blood pressure did not improve, and he was taken off of pill
line. No other medical intervention was ordered by Dr. Swindell ("SWINDELL"),
a pediatrician who is the Medical Director and only doctor at FCI Loretto.

Neither SWINDELL nor any other medical staff at FCI Loretto informed MARSHALL
about 1) a sickle alert (indicative of sickle cell disease) which showed up
in blood tests; 2) scarred lung tissue—even though MARSHALL complained in-
sistently about breathing problems, he was still not told about the scarred
lungs; or 3) an EKG showing blockage and signs that he possibly had a mild
heart attack recently. These very serious medical anomalies were only dis-
covered by MARSHALL upon his request for and receipt of a copy of his medical
records.

After arriving at FCI Loretto, MARSHALL was issued boxers (underwear) that
previously belonged to someone else, and were so worn-out and stretched out
of shape that they don't fit properly, and constantly fall down under his
pants while walking through the institution. The pants issued are no better,
because MARSHALL has to constantly hold them up or pull them back up to his

19

waist. It is also common knowledge that washing clothes (especially in the institutional laundry—where clothes come back smelling worse than they went out) does not get rid of 100% of the bacteria and DNA present on them. Who knows what is in these boxers, or how many other people have worn them? Worse still, MARSHALL is very sensitive in those areas, and can easily catch bacterial infections. Medical records will show that he has been infected before as a result of dirty clothing during his term of incarceration. In all other institutions, an arriving inmate receives new undergarments and pants that properly fit (or at least have belt loops and a belt so that you may adjust them properly. To make matters even worse, MARSHALL has been harassed by staff when his pants begin to sag on more than one occasion. When he has tried to explain his situation, it seems only to irritate the staff, and he is told things like, "You'll be alright; just pull your pants up and keep it moving, or I'm going to write you up and have you thrown in the SHU."

When it comes to masks, FCI Loretto's R&D staff confiscated MARSHALL's permanent, washable mask; staff issue only one temporary mask every three to four weeks (which cannot be washed). Therefore, in that time frame there is such a build-up of dirt, sweat, and bacteria, that MARSHALL in fact has much more to worry about than just COVID-19. He has broken out in a rash around the mouth as a result of mask-wearing (which is mandatory under lockdown, which FCI Loretto has been under for 31 of the past 32 months) on more than one occasion. This unsanitary practice actually increases the chance of catching COVID-19, because if the mask does its job and initially catches/blocks the respiratory droplets which contain coronavirus, MARSHALL now has to walk around with the coronavirus-containing droplets in his temporary mask for such a

prolonged period. Even still, the point is moot because the masks are worn
to the point of having a hole in them. MARSHALL and other inmates in most
cases are unable to receive another one, because medical staff and correc-
tional officers are instructed not to issue inmates replacement masks; only
the Unit Manager and Counselor of a housing unit are permitted to issue masks.

MARSHALL has been and continues to be denied access to rehabilitative pro-
grams and opportunities to demonstrate a level of rehabilitation to society
& the courts. Since being at FCI Loretto MARSHALL has been denied access to
community outreach programs, and denied the ability to demonstrate acts of
kindness and rehabilitation that could show the BOP, courts, and society as
a whole that he has made the necessary changes within himself to become a
productive citizen.

One example of this is an Electronic Request to Staff ("cop-out") sent to
Warden Moser ("MOSER"), the previous warden of FCI Loretto, asking for per-
mission to help the Girl Scouts of America in their time of need during the
COVID-19 crisis. This request outlined the possibility of large amounts of
donations by the inmate population for the benefit of that organization. War-
den Moser refused to even answer that request. To deny his ability to do such
things, MARSHALL asserts that the administration of this institution are stun-
ting his growth and self-worth to the point of his wondering what point is
there in even trying. If the administration of this institution are not going
to allow MARSHALL the opportunity to change for the better—as if he doesn't
deserve the opportunity to do better—then they are wrong, and in violation
of the very policies that govern this institution and the Bureau of Prisons

as a whole. The administration is also denying MARSHALL consideration from the courts and/or the White House for a possible early release or clemency. Charitable acts are the type of exceptional behavior that a judge would like to see contained in a Motion for Compassionate Release/Reduction in Sentence, because the court must consider the person that comes before them on that day, not that same person at the time of their arrest. Therefore, in a sense the administration is denying MARSHALL access to the rehabilitation he needs to demonstrate to the court in order to receive the relief he is seeking, which means this administration is deliberately hindering MARSHALL from securing an earlier release and my ability to regain life and liberty. This is just another form of denial of access to courts, because the administration and staff have taken away the things MARSHALL needs to properly present his case in court. This is unconstitutional.

MARSHALL also has to deal with the fact that since he is not First Step Act (FSA) eligible, the BOP and FCI Loretto in particular are failing both him and society at large by not providing programs that would be beneficial to his rehabilitation and reduce the possibility of him reoffending. The programs that are most beneficial which MARSHALL can supposedly enroll in he is told that he must wait until he is down to having only thirty-six months remaining on his sentence. That is eleven years from now. So for the next eleven years, is MARSHALL expected to simply sit around and do nothing to better himself? This is discrimination, and once again does not allow him to have access to important programming which can be used in a Motion for Reduction in Sentence. The administration of FCI Loretto are forcing MARSHALL to stay in prison longer than he may have to, which results in an unfair administration of justice.

Although MARSHALL is classified as a low-security inmate, with a low risk
of recidivism under PATTERN, he is being treated as a high-risk inmate; that
is to say he is being discriminated against due to the nature of his charges.
It has been documented that a person with a sex offense is less likely to
reoffend or commit the same offense than a person with a drug offense or any
other charge (with the exception of murder), yet MARSHALL is treated in the
most harsh manner by not being able to access certain necessities such as
access to electronic messaging (TRULINCS), which can provide him with legal
updates and the materials he requires. Having access to electronic messaging
would also allow him not only to correspond with organizations set up to help
inmates such as himself, but also to correspond with loved ones. Most organi-
zations set up to assist federal inmates for financial reasons and/or convenience
only communicate via email services. MARSHALL's former attorney and a few
other lawyers with whom he wishes to correspond are only accessible by email
due to their being in court all day during business hours, the volume of clients
they deal with, and the fact that some simply do not accept calls from inmates
via the TRUFONE system. According to former Warden MOSER and the BOP, the
TRULINCS electronic messaging system is safe, and protects both the public
and staff from harm (this per a memorandum from MOSER regarding the TRULINCS
electronic messaging system). The electronic messaging system is more secure
than both the TRUFONE telephone system and standard mailing procedures. It
is known that other inmates access others' phone privileges and therefore
can do other things that they should not be able to do by way of someone else's
phone. It is also known that all letters in and out of low-security institutions
are not required to be thoroughly searched unless SIS or the mailroom are
alerted to the actions of a particular inmate, and once the letter is sent

or received it may never be seen by correctional staff or law enforcement again. On the other hand, the TRULINCS electronic messaging system is accessible only via thumbprint identification, and its content can be saved in a database, readily accessible when needed. The TRULINCS messaging system does not provide access to the internet, and if anyone was to commit any illegal act via electronic messaging, they would be immediately caught and held legally accountable. It has not been proven that allowing MARSHALL to use the computer is any more dangerous than allowing him to use the phone, regular mail, or visitation—nor is it more dnagerous than allowing other inmates to use it. It was alleged in MARSHALL's criminal case that he uploaded pictures onto a website for the purposes of prostitution. Within the TRULINCS electronic messaging system, he can neither upload nor receive pictures.

Even upon release MARSHALL is allowed to have access to email and the internet, so long as it is monitored. Therefore if they system is designed to prevent inmates from being able to commit these types of crimes, then why is MARSHALL being discriminated against? There is no reason why he should be prohibited from using the service other than one's bias or opinion.

The electronic messaging system is also a cheaper (under regular circumstances) and more effective way for MARSHALL to stay in contact with his family, mentors, and other support groups. Some have very active work and personal lives, which make them not readily available by phone sometimes when he tries to call. A perfect example of this is a psychologist in California with whom he tries to stay in contact with for mental support, but due to east/west coast time differences and the fact that he works at night (which is daytime here), and

because the phones here are switched off by the time he gets off work it is rare that MARSHALL is able to communicate with him in order to get the mental reassurance he needs. The TRULINCS electronic messaging system (email) can provide that. Family support, legal aid, and mental health are some of the most important things which the BOP claims to stand by, but all of these are being stripped from MARSHALL based on his being charged with a crime that is impossible to commit through the TRULINCS email system.

Even if everyone in MARSHALL's life was readily available by telephone, the five hundred minutes allowed to an inmate monthly under the current state of emergency are not enough to be able to communicate with them on a regular basis. If MARSHALL were able to make two phone calls per day for the fifteen minutes of talk time per call allowed, his allotted phone minutes would last only sixteen days per month. There are a lot of friends and family that MAR-SHALL is unable to call due to the limited amount of phone time available to him. Access to the TRULINCS email system would allow him to regularly com-municate with everyone mentioned herein, and they in turn would have the option to send messages to him at their earliest convenience and allow MARSHALL to reestablish relationships with those whom he needs for support in order to help him turn his life around.

If those that are liable wish not to agree with the initial offer for settle-ment, I ask that the Courts in all fairness order the BOP and those that are liable to immediately grant the Motion for Compassionate Release and/or pro-vide a motion to the District Court of D.C on behalf of MARSHALL for a re-duction in sentence, and award the $25,000 that could have been awarded had

MARSHALL been able to exercise his rights in the civil tort claim. If the Court is of the belief that this initial offer should not be granted at this time, MARSHALL asks that this honorable Court allow this case to move forward for jury trial.

Upon moving forward, MARSHALL asks that all names be provided in full, and if necessary all audio/video evidence and documentation of dates and incidents be provided by the Bureau of Prisons/GEO Group correctional staff.

## SERVICE

Being an inmate, Mr. Marshall is not privy to the names and addresses mentioned in this suit, and asks that all Defendants be served by the means of this Court.

The information in this case has been presented to the best of Mr. Marshall's knowledge. It is not intended to mislead the Courts or anyone else, and is signed under the penalty of perjury.

November 30, 2022                                Respectfully submitted,

*Darya Marshall (PR)*

Daraya Marshall, 12179-007
Pro se, in forma pauperis
FCI Loretto
P.O. Box 1000
Cresson, PA 16630

26

CAPTION:

Daraya Marshall

**CERTIFICATE OF SERVICE\***

Docket Number: 3:22-cv-227

v.

GEO Group; Bureau of Prisons

I, Daraya Marshall                    , hereby certify under penalty of perjury that
(print name)
on November 30, 2022    /        , I served a copy of enjoined Bivens & Tort Claim
(date)
& supplemental documents, and two additional copies to be served to GEO Group & BOP
(list all documents)

by (select all applicable)\*\*

___ Personal Delivery          X United States Mail          ___ Federal Express or other
                               \*\*\*Institutional Mailbox\*\*\*        Overnight Courier

___ Commercial Carrier         ___ E-Mail (on consent)

on the following parties:

| Name | Address | City | State | Zip Code |
|------|---------|------|-------|----------|
| US District Court | 700 Grant St., Room 3100 Pittsburgh | PA | 15219 | |
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |

November 30, 2022
Today's Date

_Daryn Marshall_ (AR)
Signature

Certificate of Service Form (Last Revised 12/2015)