IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CIVIL DIVISION

DARAYA MARSHALL,

    Plaintiff, pro se

       v.

GEO GROUP EMPLOYEES (previously of GEO
RIVERS CORRECTIONAL INSTITUTION located
in Winton, NC 27986):
  BRICK TRIPP, Administrator;
  Mr. HINTON, Records;
  Ms. SPRUILL, Counselor;
  Ms. LASSITER, Counselor;
  Mr. JOYNER, Case Manager;
  Mrs. BURKETT, Case Manager;
  Lt. HUDSON, RHU Supervisor;
  Mr. SMALLWOOD, R&D Officer;
  Mr. HUNTER, R&D Officer;
  Unknown Female Case Manager
    Coordinator;
  Unknown Female Administrative
    Secretary;
  Officer LANGFORD;
  GEO EASTERN REGION Dir. of Operations
  RHU Sgt. HANNON;
BUREAU OF PRISONS (BOP) STAFF:
  Mr. ESPINOZA, Overseer of RCI;
  Administrative Remedy Coordinator,
    BOP Central (2020);
  S. BARLETT, Acting Warden, FCI
    Loretto;
  Mr. BRAWLEY, Associate Warden, FCI
    Loretto;
  Administrative Remedy Coordinator,
    FCI Loretto;
  Administrative Remedy Coordinator,
    BOP Northeast Region;
  DARRIN HOWARD, BOP Northeast Region
    Counsel;
  BOP General Counsel;
  Administrative Remedy Coordinator,
    Privatization MGMT Branch
  Mr. WATT, Case Manager, FCI Loretto;
  V. MOSER, Warden (former), FCI
    Loretto;
  Mrs. SIMMS, nee MOCK, EMT, FCI
    Loretto

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Bivens & Tort Claim (enjoined)

Case No.: 3:22-cv-00227-MRH-KAP

*** JURY TRIAL DEMANDED ***

AMENDED COMPLAINT

**FILED**

**MAY 1·9 2025**

CLERK, U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

1.

I.   PARTIES TO THIS COMPLAINT

   A.   THE PLAINTIFF

       Name:      Daraya Marshall
       ID #:      12179-007
       Address:   Federal Correctional Institution Loretto
              PO Box 1000
              Cresson, PA 16630

   B.   THE DEFENDANTS

       Defendant #1, in their Individual and Official capacities
       Name:      GEO Group
       Address:   13777 Ballantyne Corporate Place, Suite 200
              Charlotte, NC 28277

       Defendant #2, in their Individual and Official capacities
       Name:      Brick Tripp, Administrator
       Address:   c/o GEO Eastern Region (formerly GEO Rivers)
              13777 Ballantyne Corporate Place, Suite 200
              Charlotte, NC 28277

       Defendant #3, in their Individual and Official capacities
       Name:      Mr. Hinton, Records
       Address:   c/o GEO Eastern Region (formerly GEO Rivers)
              13777 Ballantyne Corporate Place, Suite 200
              Charlotte, NC 28277

       Defendant #4, in their Individual and Official capacities
       Name:      Ms. Spruill, Counselor
       Address:   c/o GEO Eastern Region (formerly GEO Rivers)
              13777 Ballantyne Corporate Place, Suite 200
              Charlotte, NC 28277

       Defendant #5, in their Individual and Official capacities
       Name:      Ms. Lassiter, Counselor
       Address:   c/o GEO Eastern Region (formerly GEO Rivers)
              13777 Ballantyne Corporate Place, Suite 200
              Charlotte, NC 28277

       Defendant #6, in their Individual and Official capacities
       Name:      Mr. Joyner, Case Manager
       Address:   c/o GEO Eastern Region (formerly GEO Rivers)
              13777 Ballantyne Corporate Place, Suite 200
              Charlotte, NC 28277

       Defendant #7, in their Individual and Official capacities
       Name:      Mrs. Burkett, Case Manager
       Address:   c/o GEO Eastern Region (formerly GEO Rivers)
              13777 Ballantyne Corporate Place, Suite 200
              Charlotte, NC 28277

Defendant #8, in their Individual and Official capacities
Name:     Lt. Hudson, RHU Supervisor
Address:  c/o GEO Eastern Region (formerly GEO Rivers)
          13777 Ballantyne Corporate Place, Suite 200
          Charlotte, NC 28277

Defendant #9, in their Individual and Official capacities
Name:     Mr. Smallwood, R&D Officer
Address:  c/o GEO Eastern Region (formerly GEO Rivers)
          13777 Ballantyne Corporate Place, Suite 200
          Charlotte, NC 28277

Defendant #10, in their Individual and Official capacities
Name:     Mr. Hunter, R&D Officer
Address:  c/o GEO Eastern Region (formerly GEO Rivers)
          13777 Ballantyne Corporate Place, Suite 200
          Charlotte, NC 28277

Defendant #11, in their Individual and Official capacities
Name:     Unknown Female Case Management Coordinator
Address:  c/o GEO Eastern Region (formerly GEO Rivers)
          13777 Ballantyne Corporate Place, Suite 200
          Charlotte, NC 28277

Defendant #12, in their Individual and Official capacities
Name:     Unknown Female Administrative Secretary
Address:  c/o GEO Eastern Region (formerly GEO Rivers)
          13777 Ballantyne Corporate Place, Suite 200
          Charlotte, NC 28277

Defendant #13, in their Individual and Official capacities
Name:     Officer Langford
Address:  c/o GEO Eastern Region (formerly GEO Rivers)
          13777 Ballantyne Corporate Place, Suite 200
          Charlotte, NC 28277

Defendant #14, in their Individual and Official capacities
Name:     GEO Eastern Region Staff
Address:  GEO Eastern Region
          13777 Ballantyne Corporate Place, Suite 200
          Charlotte, NC 28277

Defendant #15, in their Individual and Official capacities
Name:     RHU Sgt. Hannon
Address:  c/o GEO Eastern Region (formerly GEO Rivers)
          13777 Ballantyne Corporate Place, Suite 200
          Charlotte, NC 28277

Defendant #16, in their Individual and Official capacities
Name:     Mr. Espinoza, Overseer of GEO Rivers Correctional Institution
Address:  c/o Samantha Stewart, DOJ-USAO
          700 Grant Street, Suite 4000
          Pittsburgh, PA 15219
          Phone: 412-894-7562; Email: samantha.stewart@usdoj.gov

Defendant #17, in their Individual and Official capacities
Name:      Administrative Remedy Coordinator, BOP, Central, 2020
Address:   Federal Bop Headquaters
           320 1ST ST NW
           Washington, DC 20534

Defendant #18, in their Individual and Official capacities
Name:      S. Barlett, Acting Warden, FCI Loretto
Address:   c/o Samantha Stewart, DOJ-USAO
           700 Grant Street, Suite 4000
           Pittsburgh, PA 15219
           Phone: 412-894-7562; Email: samantha.stewart@usdoj.gov

Defendant #19, in their Individual and Official capacities
Name:      Mr. Brawley, Associate Warden, FCI Loretto
Address:   c/o Samantha Stewart, DOJ-USAO
           700 Grant Street, Suite 4000
           Pittsburgh, PA 15219
           Phone: 412-894-7562; Email: samantha.stewart@usdoj.gov

Defendant #20, in their Individual and Official capacities
Name:      Administrative Remedy Coordinator, FCI Loretto
Address:   c/o FCI Loretto
           PO Box 1000
           Cresson, PA 16630

Defendant #21, in their Individual and Official capacities
Name:      Administrative Remedy Coordinator, BOP Northeast Region
Address:   200 Chestnut ST
           Federal Bureau Prisons
           Phila, PA 19106
           United States

Defendant #22, in their Individual and Official capacities
Name:      Darrin Howard, BOP Northeast Region Counsel
Address:   U.S. Custom House
           200 Chestnut ST
           7 th Floor
           Phila, PA 19106

Defendant #23, in their Individual and Official capacities
Name:      BOP General Counsel, Tort Claim Division
Address:   Tort Claim Division
           320 First Street NW.
           Washington, DC

Defendant #24, in their Individual and Official capacities
Name:      Administrative Remedy Coordinator, Privatization MGMT Branch
Address:   Federal Bop Headquaters
           320 1ST ST NW
           Washington, DC 20534

Defendant #25, in their Individual and Official capacities
Name:      Mr. Watt, Case Manager, FCI Loretto
Address:   FCI Loretto
           PO Box 1000
           Cresson, PA 16630

4

Defendant #26, in their Individual and Official capacities
Name:      V. Moser, Warden (former), FCI Loretto
Address:   c/o Samantha Stewart, DOJ-USAO
           700 Grant Street, Suite 4000
           Pittsburgh, PA 15219
           Phone: 412-894-7562; Email: samantha.stewart@usdoj.gov

Defendant #27, in their Individual and Official capacities
Name:      Mrs. Simms, nee Mock, EMT, FCI Loretto
Address:   FCI Loretto
           PO Box 1000
           Cresson, PA 16630

## VERIFIED COMPLAINT FOR DAMAGES

## I.    INTRODUCTION

1.    Comes now the plaintiff, DARAYA MARSHALL, an adult in custody at FCI Loretto,
and brings this enjoined <u>Bivens</u> and Tort Claim alleging violations of his
constitutional rights to receive proper medical care, be provided with basic
needs to maintain personal hygiene, clean clothing, property, to be free from
interference with court access. These actions separately amount to that of violations
of Eighth Amendment conventions against cruel and unusual punishment which the
plaintiff has a right to be free from. Together, they are even more egregious,
warranting relief. The complaint also encompasses a violation of due process.
Plaintiff seeks monetary damages in excess of $75,000 and/or other relief in
the form of granting compassionate relief.

## II.   JURISDICTION

2.    Under 28 USC § 1331, federal courts have jurisdiction over cases arising
under the Constitution, laws, or treaties of the United States.

3.    Jurisdiction is invoked pursuant to 28 USC § 1332, because the matter in
controversy exceeds the sum value of interest and cost of $75,000 and is between
citizens of different states.

4.    Jurisdiction is invoked pursuant to 28 USC § 1343 because this is a cause
of action (A) to recover damages for injury to the person or property of the
plaintiff or because of the deprivation of his rights, or privileges, as a citizen
of the United States done in furtherance of a conspiracy mentioned in section

1985 of Title 24; (B) to recover damages from persons who failed to aid in remedying or preventing any wrongs mentioned which they were made aware of or should have been aware of; (C) to redress the deprivation under color of federal law, state law torts, the Constitution of the United States, or by Act of Congress providing for equal rights of citizens or all persons within the jurisdiction of the United States.

5.    Any action in tort pursuant to 28 USC § 2671, this court has jurisdiction under 28 USC § 1346(b).

6.    The court has supplemental jurisdiction of state law tort pursuant to 28 USC § 1367.

7.    A plaintiff has an FTCA cause of action against the government if he would also have a cause of action under state law against a private person in like circumstances. The violation in this claim is also considered a violation under Pennsylvania law and under North Carolina state tort law, therefore warranting or allowing a cause of action to be brought.

8.    Jurisdiction can be "where the plaintiff resides or wherein the act or omission complained of occurred." 28 USC § 1402(b), see Zakiya v. United States, 267 F.Supp.2d 47, 58 (D.D.C. 2003).

III. VENUE

9.    A "claim against officials in prison in one district and central correctional offices in another district could be filed in either district." 28 USC § 1391(b); Arnold v. Maynard, 942 F.2d 761, 162, n.2; see also Carillo v. Darden, 992 F.Supp. 1024, 1025 ("Venue was proper in district where one of several defendants live"); Smiley v. Reno, 131 F.Supp.2d 839, 841 ("where defendants lived in two districts venue was proper in either and court could not break up the case and transfer part to the other district"); Perez v. Haulk, 302 F.Supp.2d 9, 17-18 (similar to Smiley). In Perez, the court would not sever claims that were related in order

6

to transfer some claims to another district. The suit can take place where the
plaintiff resides if there is no real property involved in the action.

IV.  LEGAL STANDARD

10.  Plaintiff is not a lawyer and is proceeding pro se. Courts have generally
held pro se complaints to "less stringent standards than formal pleadings drafted
by lawyers." Erickson v. Pardus, 551 US 89, 94 (2007); Hughes v. Rowe, 449 US
5, 9 (1980) (citing); Haines v. Kerner, 404 US 519, 520-21 (1972) (per curiam)
(pro se complaints are entitled to liberal construction).

11.  The Third Circuit in Higgs v. Atty. Gen., 655 F.3d 333, 339 (3rd Cir. 2011),
explains "that [the courts'] policy of liberally construing pro se submissions
is driven by the understanding that ... there is an obligation on the part of
the court to make reasonable allowances to protect pro se litigants."

12.  If factual allegations support a valid claim, the court should treat the
complaint as raising that claim, even if one has not cited the right legal theory.
Phillips v. Girdich, 408 F.3d 124, 130 (2d Cir. 2005); O'Grady v. Village of
Libertyville, 304 F.3d 719, 723 (7th Cir. 2002) (A plaintiff is not require to set
forth a legal theory to match the facts, so long as some legal theory can be
sustained on the facts pleaded in the complaint.) Thus, in Curry v. Kerik, 163
F.Supp.2d 232, 237 (S.D.N.Y. 2001), the plaintiff alleged he had been injured
by hazardous conditions through the defendant's negligence which does not state
a federal constitutional claim, however, the facts alleged supported a claim
of deliberate indifference and the case was allowed to go forward even through
he had not pled a deliberate indifference claim. Factual allegations of the complaint
shall be taken as true for purposes of screening.

V.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

13.  Plaintiff has exhausted all administrative remedies related to the claims
raised herein. Documents demonstrating that exhaustion, both within the GEO system

and within the BOP will be provided for discovery purposes when the court grants permission to do so.

VI.   STATEMENT OF FACTS

14.  On or about August 26, 2020, while at Rivers Correctional Institution ("RCI"), the plaintiff DARAYA MARSHALL ("MARSHALL") was placed in the Restricted Housing Unit ("RHU") until being transferred on February 16, 2021. On the first day in the RHU, medical staff specifically told the two officers (whose names are unknown; plaintiff intends to file a motion for discovery to obtain the correctional records of those assigned to the RHU that day) who placed MARSHALL in the cell, and the evening shift Sergeant HANNON about the need for power for his CPAP machine.

15.  MARSHALL was prescribed a CPAP machine after the doctor at RCI sent MARSHALL for an overnight sleep study to determine a) if he had sleep apnea and needed such a machine, and b) if he did have sleep apnea, would providing him with such a machine help lower his blood pressure which the doctor believed may have been a major cause of his elevated blood pressure.

16.  Despite this, MARSHALL was locked in a cell for roughly 26 days with an inoperable shower and no electricity for his CPAP. For the first few days in the RHU, MARSHALL was also intentionally denied the use of his prescription glasses because Sgt. HANNON refused to give MARSHALL his property, even after MARSHALL informed him of the need for his glasses. Another officer acknowledged MARSHALL was being treated unfairly and needed his glasses. That officer took it upon himself to locate the glasses. MARSHALL was also restricted from purchasing commissary items that all other similarly situated inmates (not on restriction) in the RHU were allowed to purchase.

17.  During that time, MARSHALL made several verbal complaints to staff and wrote an informal resolution concerning the issues described above. Informal resolution is the first step in the administrative remedy process according to RCI policy.

The issues were no addressed or remedied. It was not until September 21, 2020 that MARSHALL spoke with the Outside Case Manager Coordinator who had Special Investigative Services (SIS) come see MARSHALL. MARSHALL told the SIS staff member what was going on. MARSHALL was informed by SIS that no disciplinary action would be taken against him,   · because there was nothing to substantiate the allegation that led to MARSHALL being placed in the RHU, yet MARSHALL was still not released back to general population. Although the SIS staff assured that the shower would be fixed and the power would be turned on for MARSHALL, the commissary restrictions were still in place, and the cruel and unusual punishment took on other forms.

18.   The very same day, September 21, 2020, after clothing was sent to the laundry department to be washed, MARSHALL did not receive his clothing back, leaving MARSHALL with only one jumpsuit, one t-shirt, and one pair of underwear. Officer LANGFORD ("LANGFORD"), who was passing the clothing back to the inmates, was informed. LANGFORD instructed MARSHALL to fill out a request form for the clothing to be replaced. The request to staff was completed and given to LANGFORD. On September 22, 2020, MARSHALL asked the RHU supervisor, Lieutenant HUDSON ("HUDSON") if she had seen the request. HUDSON replied that she had. No clothing was received by MARSHALL. MARSHALL continued his grievance process by now filing a Step 1 Administrative Remedy form concerning all the abuse and neglect mentioned above, as well as the clothing issue and commissary restriction.

19.   The facility administrator, Brick TRIPP ("TRIPP") responded on October 22, 2020, by saying that he was told, by HUDSON, that all of MARSHALL's issues had been resolved. This was not true. MARSHALL then spoke with several sergeants in an attempt to prove that TRIPP was being lied to by HUDSON. MARSHALL asked the sergeants to search his cell to prove that he did not have proper clothing, and had a receipt that showed that he was denied items from commissary that other RHU inmates were allowed. It was not until November 1, 2020, approximately 41

9

days after MARSHALL's clothing was not returned that he was able to get Sergeant WHITE ("WHITE") and Officer BAKER ("BAKER") to conduct a cell search to prove that MARSHALL was telling the truth. Had TRIPP done his job by investigating the matter himself, instead of relying on the words of the same individual who was responsible, in part, for the filing of the grievance, he would have discovered the same. As such, TRIPP was neglectful of his duties to ensure that MARSHALL was not continually being mistreated. Therefore, he rendered the entire grievance process to be of no use. WHITE signed a request form as documented proof, which MARSHALL still has in his possession. It is also documented within MARSHALL's medical records that MARSHALL contracted a bacterial infection on his penis and testicles from having to wear the same soiled clothing for 41 continuous days.

20.  After finally being able to secure proof--the request form signed by WHITE-- MARSHALL was further hindered in his attempt to get copies of the paperwork to attach to the Step 2 Administrative Remedy form that now needed to be sent to the Eastern Region branch of GEO. MARSHALL spoke with A-Unit Counselor LASSITER ("LASSITER") twice concerning obtaining copies. LASSITER replied by stating that she did not have time to make copies, and to, instead, ask RHU staff. A-Unit Counselor SPRUILL ("SPRUILL"), at this time, was not coming to the RHU as she should have been. MARSHALL attempted to ask several security staff as LASSITER instructed. He asked Lieutenant BOTTOMS ("BOTTOMS") and WHITE, who said that a counselor must do that, not security. He also asked RHU Officer SMALLWOOD ("SMALLWOOD") and DOBAY ("DOBAY"), who told him to talk to HUDSON.

21.  Let the court note that HUDSON is the RHU supervisor who told TRIPP that all of MARSHALL's issues had been resolved. Because of the position HUDSON holds, any grievance about the RHU comes back to her--a clear conflict of interest-- therefore, it is against policy to force MARSHALL to seek help from a person who is partially the cause of the grievance and can easily hinder the process to serve their own purposes. It is also against policy for any security staff

to handle such matters, period. It is the job of the counselors, case managers, and/or other administrative staff. MARSHALL was placed in a situation that he should not have been in, by being forced to ask HUDSON for assistance. Indeed, out of fear of not getting the paperwork back and/or facing harsher retaliation, MARSHALL felt he had to redact some of the complaint.

22.  Initially, HUDSON said she did not have the time. The following week, she was in training and MARSHALL attempted to ask Sgt./Lt. MARTINEZ ("MARTINEZ") and another female Sergeant who was only on temporary duty in the RHU for HUDSON for the week of November 9-13, 2020. MARSHALL was finally able to secure copies that afternoon when HUDSON came in briefly, but still had no choice but to place the copies in the hands of the same RHU staff to be mailed to the GEO Eastern Region office. Although the Eastern Region is headquartered within the same state, the documents did not reach their offices until eight days later. One has no choice but to assume it was deliberately held up.

23.  A few days after sending the Step 2 Administrative Remedy, all of MARSHALL's property was taken from him. This occurred on November 17, 2020 under the guise of MARSHALL's supposed transfer on November 19. On the morning of November 19, the transport officers informed MARSHALL that he was not on their list and that they did not know anything about him. A witness to this was RHU Officer MITCHELL ("MITCHELL"), and another RHU officer whose name is unknown (if necessary, a discovery motion for a full GEO roster and/or assignment list will show who the officer was who was working at that time: November 19, 2020 between 3:00am and 6:00am), as well as the transport officers on duty. RHU camera footage would also have documented this and other dates and events mentioned in this complaint. If the Defendants wish to dispute any of this, MARSHALL pleas with the court to compel the Defendants to bring forth all relevant ledgers and camera footage in connection with all times and dates mentioned, and to provide the full name of all staff involved.

24.  MARSHALL immediately began to make oral complaints, on November 19, 2020,
in an attempt to resolve these issues, as instructed by the GEO Handbook under
"Administrative Remedy Process" (GEO Handbook, p. 11).

25.  MARSHALL spoke with Federal Bureau of Prisons ("BOP") staff member Mr. ESPINOZA
("ESPINOZA") who was the overseer of RCI. He also spoke with LASSITER and HUDSON.
He told each of them that he felt he was being retaliated against, as per the
GEO Handbook (p. 1), which states that retaliation for exercising an individual's
right to administrative remedy proceedings is against GEO policy.

26.  More importantly, MARSHALL explained that he had a $25,000 civil tort claim
in court, on which he had received, on November 16, 2020, a motion to dismiss.
One day before MARSHALL's property was taken was when he received this document
from the court. Therefore, MARSHALL was not given ample time to respond to the
motion. MARSHALL asked that his property be returned if he were not scheduled
to leave so that he might respond to the motion. The lawsuit concerned the willful
destruction of property at Peidmont Regional Jail before the 30-day policy with
which to pick up property or have the property arranged to be picked up. Therefore
making the jail liable for everything within the property. The motion to dismiss
the claim indicated that MARSHALL had only one year to file the claim, but this
pertained only to inmates in Peidmont Regional Jail. Inmates no longer in their
custody had two years in which to file such a claim. Had MARSHALL been given
the opportunity, and his property, he could have stopped the dismissal and moved
on to win the case. MARSHALL also asked LASSITER if he could get something in
writing from her to explain to the court what was going on. She said that she
would provide something, but MARSHALL never received anything--even after speaking
to LASSITER several more times after that.

27.  MARSHALL also explained to all of the staff he interacted with that he had
a) a deadline to file his § 2255 Ineffective Assistance of Counsel motion in
his crimial case, and b) he had a § 3582 motion for Compassionate Release that

was in progress which he needed to take next steps on, as well as c) a complaint
to the Officer of the Attorney General's Integrity Board that he needed to finish,
d) a complaint to the Department of Justice that he needed to work on, and e)
a petition to Congress that needed to be done.

28. On November 20, 2020, he spoke with A-Unit Case Manager JOYNER ("JOYNER")
about the same. A-Unit Case Manager ASHE ("ASHE") was not coming to the RHU as
she should have been, so he could not speak with her about this. Nonetheless,
he spoke with several staff members about not having hygiene products or shower
shoes--which forced him to have to stand on his boxer shorts while taking a shower
for the next few months to keep him from standing directly on the dirty shower
floor. This continued until he was transferred. MARSHALL was forced to buy new
products which, due to his financial state, he could not afford, especially as
he would have to leave those products behind--back staff at RCI refused to pack
any additional items with the property they had already taken for his transfer.
To purchase new items caused a loss, but to leave them behind caused a bigger
loss. He was denied access to his address book and phone numbers, which deprived
him of communication with some friends and family, even to the point of not being
able to do simple, yet important things like send out birthday and holiday cards.
Family communications is one of the major factors that case managers grade inmates
on, so to deprive a person is to once again violate policy and rights. MARSHALL
was denied access to letters, pictures, radio, books, and other things in his
property that could have helped him cope with the environment. To not have these
things along with all else that was being done to him on added to the trauma.
He was being emotionally and mentally scarred. He began to have unhealthy thoughts.
The correctional staff were fully aware of the ramifications of inmates not having
material with which to cope with idleness.

29. In an attempt to, once again, stop the actions against him and resolve the
issues of property and denial of access to the courts, MARSHALL, on November

25, 2020, sent four informal resolution forms to A-Unit Counselors SPRUILL and LASSITER. On November 27, 2020, he informed LASSITER that he sent the informal resolution forms through internal mail. On December 8, 2020, LASSITER informed MARSHALL that SPRUILL did have the informal resolutions. Within the informal resolution, he asked SPRUILL and/or LASSITER to contact the courts and let the courts known that what was going on in regards to his property--MARSHALL also explained that if he did not get his property back so that he could answer the motion, or if SPRUILL and/or LASSITER did not contact the court, the liability of the tort claim would fall on GEO and all staff involved. Also addressed were the issues mentioned above and the fact that MARSHALL's mail was being handled improperly which caused his mail to take longer to go out and get to him. His Step 2 Administrative Remedy took eight days to reach the Regional Office when it should have only taken two or three days. MARSHALL was also given mail by Officer MABINE ("MABINE") on Saturday, when mail does not even run in RCI on Saturdays. When MARSHALL asked MABINE about this, MABINE stated that it had been sitting in the "control bubble" for a couple of days. Even after filing informal resolutions, a holiday card sent by MARSHALL's grandmother was postmarked thirty days prior to it being received by him, and newspapers that MARSHALL had previously received every Monday were now coming that Friday or the following Monday. It was also discovered later that the Compassionate Release motion sent to the court and the letters requesting an extension for his criminal case never actually reached the courts.

30.  On December 14, 2020, MARSHALL asked LASSITER to inform SPRUILL that he needed an answer to his informal resolution request so he may move on to a Step 1 Administrative Remedy, the next step in the grievance process.

31.  On December 17, 2020, during a Team meeting with SPRUILL and Case Manager BURKETT ("BURKETT"), MARSHALL was told by SPRUILL that she had shredded the informal resolution because they had been sent through the internal mail system

and she could not be sure that it was MARSHALL who wrote them. Let it be noted that LASSITER informed SPRUILL that MARSHALL had, indeed, written them, and later followed up looking for a reply. MARSHALL spoke to LASSITER three times about this. Also, because SPRUILL was not doing her rounds in the RHU at that time-- as is required--MARSHALL's only access to her was, in fact, through the internal mail system, which is what the system was designed for--and RCI's Handbook instructs inmates to use the internal mail system to reach staff when they are unable to communicate with them in person for any reason.

32.  To make matters worse, on December 8, 2020, when MARSHALL gave BURKETT a request form asking her to confirm that SPRUILL said she shredded the informal resolutions, the request form came back from BURKETT (through internal mail) stating that SPRUILL had (mysteriously) found the informal resolutions she had stated that she shredded, and that she was going to send them back--which she did, unanswered--through internal mail. Not only did she lie by saying that she did not know if MARSHALL had been the one to send them--even after it was confirmed to her by LASSITER more than once--but, then, she lied about shredding them after MARSHALL verified to her, in person, that he sent them. Then, after all that, she sent them back through the same internal mail system and told MARSHALL that he had to do them all over again. This was unbelieveably unprofessional of her, and one has no choice but to believe she was intentionally trying to hinder his grievance process. He also explained to her that he was in a time-sensitive situation with the courts, about which it is obvious she did not care at all.

33.  On December 29, 2020, after having to wait several days for a Unit Team member to come through the RHU, MARSHALL gave BURKETT the rewritten informal resolutions directly to give to SPRUILL. These were still concerning the property matter and her contacting the courts, as well as the other issues mentioned. SPRUILL replied, stating that she spoke with R&D Officer HUNTER ("HUNTER"), and

RHU Supervisor HUDSON concerning the property. Afterward, HUDSON said she spoke with R&D as well. MARSHALL had no way of verifying this, but his property was, nevertheless, still not returned. What is sure is what SPRUILL did not do, which was go beyond simply asking an R&D officer (i.e., HUNTER), instead of speaking with a supervisor when the problem was clearly not resolved. Also, SPRUILL did not contact the courts, nor did she address any of the other outstanding issues, all of which were well within her power. According to the RCI Handbook (p. 2), "[t]he Counselor is supposed to help with daily problems and personal difficulties" and the case managers are supposed to help as well.

34. On January 12, 2021, MARSHALL sent a Step 1 to Administrator TRIPP, addressing all of the same issues raised in the informal resolutions. MARSHALL also explained that liability will shift to TRIPP's staff, TRIPP himself, and the GEO Group corporation if MARSHALL did not get any assistance. There was no response.

35. On February 11, 2021, MARSHALL sent a Step 2 to the GEO Group Eastern Region. He restated the same, and explained the steps he took prior to sending the complaint to them. There was, again, no reply. Because MARSHALL suspected that either the mail addressed to the Eastern Region would be interfered with or those at the Eastern Region may simply act as if they never received it, or as if it was received too late, MARSHALL had the Sergeant on duty sign a request form stating that MARSHALL gave him the envelope addressed to the Eastern Region at that time. Also, a stamped envelope was placed within the parcel sent to the Eastern Region so as to cover the mailing expenses in case MARSHALL was actually transferred to another facility before a response was available. In any case, there was no response sent, therefore making the person or persons who were put in place to handle such grievances neglectful--and liable--as well, because they are supposed to ensure that any issues are addressed and a proper remedy is provided, or an answer stating why relief cannot be granted.

36. During the time leading up to the transfer, MARSHALL also sent a Motion

for Compassionate Release/Reduction in Sentence under § 3582 due to the incidents that had already occurred at the time, along with the threat of COVID-19 to his already perilous health. It was denied.

37.   After exhausting all of the remedies provided within the GEO system, MARSHALL sent the complaint and the appeal for the Request for Compassionate Release on November 30, 2020 to the Administrative Remedy Coordinator of the Privatization Branch of the BOP in Washington, DC. It was stamped so as to indicate that the paperwork was not received until about thirty days later, on December 30, 2020. A response was not documented until March 16, 2021. It was received at FCI Loretto on April 6, 2021. After over one hundred days, the Administrative Remedy Coordinator (or whomever was assigned the case) did not even address the issues--instead, waiting until after MARSHALL was transferred--then stated that MARSHALL needed to get his current Warden and Region's response at his new institution, even though that Warden and Regional Office had nothing to do with the actions of the staff at RCI nor those of GEO Group's Eastern Region office. To respond in such a manner and ignore the immediate issues makes the Administrative Remedy Coordinator (or whomever was assigned MARSHALL's case) neglectful of their duties; as such, they should be held liable for all that has happened as well. The administrative remedy process should have been considered exhausted at this point, but MARSHALL strove for compliance and did what was requested of him by filing a Request for Compassionate Release/Reduction in Sentence with the Acting Warden of FCI Loretto, and with the Northeast Region of the BOP, addressing not only what happened at RCI, but what was going on at FCI Loretto as well. The Acting Warden ignored the issues raised, and an electronic inmate request to staff (a "cop-out") to review the documents again was sent by MARSHALL.

38.   MARSHALL also sent a tort claim to the BOP General Counsel, Tort Claim Division, which sent the tort claim, in turn, to a Darrin HOWARD ("HOWARD") in the Northeast

Regional Office in Philadelphia. HOWARD stated that MARSHALL should send the documents to RCI, even though MARSHALL provided copies of page ten of the RCI Handbook and documentation from RCI's Administrator TRIPP directing MARSHALL to send all tort claims concerning RCI to the Office of the General Counsel of the BOP in Washington, DC. MARSHALL asks that the name of the person responsible within the Office of the General Counsel be provided and that they be added to this suit for their neglect and indifference.

39.  The following is not a claim that the grievance process is slow, rather it is  to show the length that BOP and GEO employees go through to attempt to hinder a person through different means. One being giving MARSHALL a grievance back so late that it is declared untimely if he tries to respond, thereby making the process null and void.

40.  After not receiving a response from the Acting Warden for the request to review the documents, and with no further instructions from Acting Warden BARLETT ("BARLETT") within his response, MARSHALL proceeded to the Northeast Region.

41.  The Northeast Region sent the documents back and requested that MARSHALL elicit another response from BARLETT by filing a BP-9 (BOP Administrative Remedy) form.

42.  On May 18, 2022, MARSHALL received a BP-9 through Counselor FORLINA ("FORLINA") and turned it back in on June 2, 2022. It was dated to have been received and answered six days later on June 8, 2022. MARSHALL received it back by mail on June 13, 2022 at, approximately, 3:45pm, but was instructed to respond within five days of the June 8, 2022 date--impossible to do so since he received it on the fifth day. MARSHALL immediately brought this to Unit Officer GLENN ("GLENN")'s attention, and asked GLENN to sign it, verifying that MARSHALL had just received it from him. GLENN stated that MARSHALL was not the only one with the same issue, and mentioned two other inmates that had received responses at that time saying the same. GLENN also stated that he could not sign it for MARSHALL. Since GLENN

18

,was the staff member who gave MARSHALL the document, MARSHALL is unaware of a policy that would prevent GLENN from verifying that he received it from him on that date, especially in light of the fact that there were no administrative staff available to MARSHALL at that time.

43.  Since there was no administrative staff available at that time, MARSHALL immediately spoke with FORLINA the next morning (June 14, 2022). FORLINA instructed MARSHALL to talk with the administrative staff during mainline about a) the timeline; b) the fact that MARSHALL could not go back to an informal resolution request (BP-8) after BARLETT's response, and c) that there are many factors in a Compassionate Release/Reduction in Sentence motion, and it is not limited to one issue or one continuation page/exhibit, which was the reason for the denial.

44.  During the noon meal, MARSHALL spoke with Associate Warden BRAWLEY ("BRAWLEY"), who instructed him to go ahead and file his response. Due to the fact that FORLINA's "open house" hours (8:00am-8:30am) were over for the day, MARSHALL had to wait until 8:00am the next day (June 15, 2022) to get another BP-9. After filling out the BP-9, MARSHALL had to wait again until 8:00am the following day (June 16, 2022) to turn it back in to FORLINA. (This is another example of the oppressive nature of these institutions: out of an entire day, inmates are only allowed that thirty-minute window to meet with their counselors—no matter how important an issue is that may come up after that time, one is unable to get any sort of assistance, and if an inmate has to perform other responsibilities during the day, they will be required to miss or juggle these responsibilities in order to see his counselor).

45. The Administrative Remedy Coordinator (whose name is illegible) stated that the aforementioned BP-9 was received that day (june 16, 2022) and rejected on June 17, 2022 because MARSHALL did not answer in the five-day window following the June 8, 2022 date. As explained above, there was no possible way MARSHALL could have done so, and since it normally only takes on day via institutional

mail for such documents to be delivered, it can be reasonably believed that this inexplicable delay occurred deliberately to stop MARSHALL's process.

46. After receiving the new rejection, MARSHALL again spoke to BRAWLEY. He had Unit Manager FANNIN ("FANNIN") issue MARSHALL another BP-9 and instructed MARSHALL to complete it again, attach BARLETT's initial response, remove the other exhibits, and send him an email after MARSHALL turned it in again, so that BRAWLEY could make sure it gets answered this time. Instead of being answered properly, however, it was claimed, again, to be untimely.

47. The response from the Northeast Regional Office was to "concur with the rationale of the institution." MARSHALL then proceeded to the General Counsel at the Central Office in Washington, DC by filing a BP-11. The response to this was a) "You submitted your request of appeal to the wrong level," and b) to "concur with the rationale of the Regional Office and/or Institution. Follow directions provided on prior rejection notices." Reason a) is untrue because MARSHALL immediately sent an electronic request to Acting Warden BARLETT to revisit these issues after the initial rejection from him. That should have been an exhaustion at that level. After thirty days with no answer, MARSHALL sent an appeal to the Northeast Region, but was instructed to send another request to the Acting Warden of FCI Loretto to reconsider through a BP-9--which MARSHALL did as soon as possible. Therefore, reason a) is gravely incorrect. Reason b) is equally wrong in that MARSHALL did everything possible to follow the directions of prior rejections, even though Counselor FORLINA, Case Manager WATT ("WATT"), and Unit Manager FANNIN instructed MARSHALL that said directions were incorrect.

48. The Central Office also noted that "[i]f staff provide a memo stating that late filing was not your fault, then re-submit to the level of the original rejection." After receiving this, MARSHALL sent an electronic cop-out to Associate Warden BRAWLEY explaining what was said and that MARSHALL needed a memorandum addressing

the issue. BRAWLEY instructed to see him during the noon meal. As instructed,
MARSHALL did so, and re-explained the whole situation. BRAWLEY responded saying
no one was going to write a memo admitting their own wrongdoing. BRAWLEY stated
that MARSHALL did not have to go through the whole process to file for
Compassionate Release/Reduction in Sentence. MARSHALL proceeded to explain once
again that he only asked for the Compassionate Release/Reduction in Sentence
and $25,000 tort claim as a remedy for the cruel and unusual punishment he endured,
COVID-19, and all else mentioned herein, and that MARSHALL's intention was to
file suit if this remedy could not be satisfied. Therefore, MARSHALL had to exhaust
all remedies. BRAWLEY then stated that there was nothing he or his staff could
do concerning the tort, and that MARSHALL could not win his claim of denial of
access to the courts, nor some of the other issues MARSHALL mentioned. MARSHALL
understood that this is the mentality of most BOP staff, but he knew he had to
ask for the sake of exhaustion of all available avenues known to him to remedy
the violations. At this time, all available administrative remedies have been
exhausted.

49.  MARSHALL has been denied proper medical treatment from day one. In February
2021, MARSHALL arrived at FCI Loretto. Immediately, his CPAP machine was taken
by medical staff member Mrs. SIMMS ("SIMMS") (formerly Mock). At the time of
the initial complaint, it had been approximately 21 months since MARSHALL had
been able to use his CPAP machine. The issues had still not been properly addressed,
and, at this point, it has been 51 months. MARSHALL has, effectively, gone without
his CPAP machine for the entirety of his incarceration. The effects of this neglect
and deliberate indifference have left MARSHALL spending years waking up each
night gasping for air, and, as such, does not allow him a proper night's sleep.
The lack of oxygen flowing through the brain, lungs, and other organs throws
off the orderly function of MARSHALL's body and has deeply affected both MARSHALL's
everyday moods and his overall health. MARSHALL has experienced a lack of energy,

for one thing. He falls asleep at the proverbial "drop of a hat," sometimes during conversations, classes, games, or while watching television. When he is not in and out of consciousness, he breathes like he is asleep or out of breath, even while still. He wakes with headaches and has become absentminded at times; MARSHALL frequently starts off somewhere to complete a task only to be momentarily distracted and then forget what his original intention was. He has reported continuously forgetting the names of people with whom he interacts on a regular basis and people he has known for years in society. MARSHALL frequently misspells simple words.

50. Untreated sleep apnea is known to put a patient at a five-times higher risk of heart disease and can affect blood pressure and diabetes. Staff at the RCI determined that MARSHALL's lack of a CPAP machine caused his elevated blood pressure. Since the initial complaint, MARSHALL has been given higher doses of two blood pressure medications and the doctors have added a third one plus a cholesterol pill. MARSHALL now takes four different pills for blood pressure. MARSHALL has also been prescribed medication for diabetes within the last six months. Since his original complaint, MARSHALL has also been prescribed two new eyeglass prescriptions requiring him to wear bifocals. All of this clearly demonstrates the worsening of his condition. The rapid decline in health could have been prevented if the underlying problem—MARSHALL's sleep apnea—was ministered to by the medical staff at the RCI, rather than a litany of different medications being prescribed for the symptoms of untreated sleep apnea.

51. The fact that MARSHALL needs a CPAP machine is not just known to medical personnel and in the medical records, it is in MARSHALL's central file—someplace where all BOP employees can see and/or print it at team meetings held by his case manager. Yet, despite all of the write-ups concerning this (a BP-8, -9, -10, and -11, in addition to a complaint filed in court), MARSHALL has still

22

gone over four years (and counting) without his CPAP machine. This is an example
of complete and blatant deliberate indifference to MARSHALL's medical needs.

## VII. AVERMENT OF THE CLAIM

52.  The acts and omissions of the Defendants outlined in the complaint above
infringed on the rights of MARSHALL to not "be deprived of Life, Liberty or Property
without due process of law," to be free from interference with the courts, and
to be free from "cruel and unusual punishment" in violation of the Fourth, Fifth,
and Eighth Amendments to the United States Constitution, the Federal Tort Claims
Act ("FTCA"), State Tort Law of Pennsylvania, State Tort Law of North Carolina,
and in violation of 28 CFR §§ 512.11, 552.22, 553.10, 553.13, Inmate Patient
Rights and Responsibilities as outlined in BOP Program Statement P6013.1 and
Standards of Employee Conduct as outlined in BOP Program Statement 3420.11 when:

1.  CAUSE OF ACTION: Deliberate indifference to medical needs at GEO RCI
    against HANNON and HUDSON amount to an Eighth Amendment claim in their
    individual capacity and/or a tort action in their professional capacity
    while acting under BOP (government) authority.

    A.  HANNON was informed by medical staff that MARSHALL needed the
        use of his CPAP machine and MARSHALL later informed him again
        about the fact that the power was not working for his CPAP machine.
        MARSHALL also informed HUDSON, the RHU supervisor. The RHU is
        required to have an informational folder on each inmate which
        medical staff is required to submit to documenting any injuries
        and medical needs, upon arrival. HANNON and HUDSON both acted
        with deliberate indifference to the medical needs of MARSHALL
        and intentionally put him at risk of more serious complications
        from untreated sleep apnea causing MARSHALL to not get proper
        rest due to continually waking up gasping for air. Approximately
        26 days with no power is enough, in itself, to show deliberate

23

indifference.

2.  CAUSE OF ACTION: Denial of personal hygiene by HUDSON and HANNON amounts
    to an Eighth Amendment claim and/or Tort action.

    A.  To intentionally deny a human being (which includes prisoners)
        a shower for almost 26 days is cruel and unusual punishment. Both
        HUDSON and HANNON were both made aware of the inoperable shower,
        yet refused to remedy the issue until forced to by administrative
        staff. Yet, the embarrassment of the odor MARSHALL accumulated
        caused him to refuse recreation because he was afraid of what
        the other officers and inmates would say about the odor.

3.  CAUSE OF ACTION: Denial of medical needs against HANNON for denying
    MARSHALL his eyeglasses.

    A.  Denying MARSHALL access to his prescription eyeglasses is cruel
        and unusual punishment. HANNON was made aware, by MARSHALL, of
        the need for his glasses and HANNON intentionally withheld them
        from MARSHALL.

4.  CAUSE OF ACTION: Equal protection claim against HUDSON and TRIPP

    A.  While in the RHU, MARSHALL was initially denied the benefit of
        receiving commissary items that other RHU inmates were allowed.
        This was done without MARSHALL receiving any disciplinary infraction
        and without due process. To prove this, MARSHALL has the RHU commissary
        sheet from GEO RCI and the receipt showing the items he is unauthorized
        to receive. MARSHALL was intentionally being punished without
        just cause. TRIPP was informed about this action through the grievance
        process, yet he claimed that MARSHALL was not on any restriction.
        Despite this, MARSHALL possesses a receipt showing otherwise,
        demonstrating MARSHALL was on a restriction or that TRIPP either
        failed to properly investigate or was complicit in a targetted

24

action against MARSHALL.

5.   CAUSE OF ACTION: Denial of clean clothes against HUDSON, HANNON, LANGFORD,
     TRIPP, and the GEO Director of Operations for the Eastern Region. All
     Defendants here are liable by tort in their official capacities and
     under the Eighth Amendment under their individual capacities.

     A.   As stated within the Statement of Facts, other forms of abuse
          or attack continued after the initial 26 days which led to the
          next 41 days wherein MARSHALL was subjected to possessing only
          one pair of underwear, one t-shirt, and one jumpsuit which led
          MARSHALL to contract a bacterial infection. Officer LANGFORD was
          the officer on duty on September 21, 2020 and it was his job to
          ensure that MARSHALL received clothing—or, at a minimum, his
          previous clothing issue back. He did not attempt to locate the
          clothing and merely told MARSHALL to fill out a request for more
          clothes. MARSHALL did so. HUDSON never returned with the clothing
          and lied to TRIPP about it. TRIPP never investigated it as he
          should have, nor did the Director of Operations, therefore making
          all parties liable for the bacterial infection and the cruel and
          unusual punishment and the suffering endured by MARSHALL.

6.   CAUSE OF ACTION: Deprivation of property, due process, denial of access
     to the courts and/or interference with access to the courts, and
     retaliation claimed against HUDSON, SMALLWOOD, ESPINOZA, TRIPP, and
     SPRUILL. All Defendants are liable by Tort in their official capacities
     and under the Eighth Amendment in their individual capacities.

     A.   After securing proof through WHITE's signing of the request form
          that MARSHALL had been without proper, clean clothing for weeks,
          MARSHALL sent a copy out addressed to the Eastern Region with

a Step 2 Administrative Remedy a few days later. MARSHALL was
retaliated against by way of having all of his property taken
under the guise of being transferred. This transfer never arose
and was discovered to be a lie through the records office supervisor.
The outcome was that MARSHALL was denied and deprived of his property
without due process, which also interfered with MARSHALL's civil
matter against Peidmont Regional Jail for destroying MARSHALL's
other property. This denial of access to the courts resulted in
MARSHALL's case being dismissed after he was unable to respond
to a Motion to Dismiss filed by the Defendants in that action--this
was premised off a faulty argument that MARSHALL had only one
year to file such a claim, whereas MARSHALL could have proven
that he, actually, had two years. All Defendants in this present
action- the GEO RCI staff named above--were fully aware that MARSHALL's
property should not have been taken and they were made aware of
the need to retrieve his property for court-related reasons by
MARSHALL himself. MARSHALL's case was dismissed causing him to
lose the $25,000 claim. MARSHALL explained verbally and with his
grievance that if he did not receive his property in time, the
liability of the suit would transfer onto GEO and/or its employees.

7.   CAUSE OF ACTION: Deprivation of property, due process, denial of access
to courts and/or interference with access to the courts, and retaliation
claimed against HUDSON, SMALLWOOD, ESPINOZA, TRIPP, and SPRUILL.

A.   In retaliation for exercising the grievance process, MARSHALL's
property was taken without due process. This caused MARSHALL to
be unable to file his § 2255 Ineffective Assistance of Counsel
motion dealing with his criminal case. Counsel in MARSHALL's
criminal case was ineffective in numerous ways, but for the sake

26

of brevity, MARSHALL will only highlight two:

1.  MARSHALL's attorney did not object to the use of an expert
    witness the court had determined might be prejudicial to
    MARSHALL. It was determined that instead of allowing the
    witness to go on before the alleged victims, she would go after.
    MARSHALL's attorney should have objected and pointed out
    that if the testimony would be prejudicial, than it would
    make no difference if the jury heard her before or after--the
    testimony is still prejudicial.

2.  MARSHALL's attorney was ineffective during sentencing when
    counsel never presented her own comparative cases, nor presented
    the one prepared by MARSHALL, but instead relied on the one used
    by the government which misrepresented the seriousness of the
    comparative case of Shelby Lewis, 791 F.Supp.2d 81. This alluded
    to the judge that MARSHALL had more victims and a worse case,
    when, in actuality, the Lewis case involved kidnapping, stabbing
    of girls, an appalling amount of forced sex acts and forced
    drug use, child pornography, four victims (two under the
    age of fourteen and one in Lewis' custody). There was no violence
    in MARSHALL's case and the young women admitted at various
    stages that they lied about their ages. Despite this, MARSHALL
    was given a higher sentence because the court was misled into
    believing that MARSHALL's case was worse.

Whether either of these arguments, or any of the other arguments,
would have been successful cannot be concluded here. The point
is that MARSHALL was denied the opportunity to present his § 2255
arguments and bring these claims before a court when he was deprived
of his property without due process. Because of the actions of

27

the Defendants named above, MARSHALL became time-barred from raising these issues and potentially obtaining relief.

8. CAUSE OF ACTION: Supervisory liability against GEO Records Officer HINTON, Unknown Female GEO Administrative Secretary, GEO Eastern Region Director of Operations, Administrative Remedy Coordinator (BOP Privatization Branch), BOP Overseer ESPINOZA, BOP Acting Warden BARLETT, BOP Associate Warden BRAWLEY, Administrative Remedy Coordinator (FCI Loretto), Administrative Remedy Coordinator (Northeast Region, BOP), BOP Northeast Region General Counsel Darrin HOWARD, Administrative Remedy Coordinator (BOP Central Office), and Tort Claim Division (BOP Central Office).

  A. Each Defendant in their role as supervisor was made aware of the tortous and <u>Bivens</u> acts within. Each one has a duty within his or her respective office to investigate and remedy violations of policies, laws, and of the constitution, as well as to uphold the same. Each Defendant, acting with deliberate indifference, resulted in continued and/or further harm upon MARSHALL. The Defendants were deliberately indifferent to the health and medical needs of MARSHALL. Each acted in furtherance of their subordinates by ignoring the rights of the Plaintiff. MARSHALL's rights were denied by his not being able to address the courts in an attempt to secure his civil rights and petition for his life and liberty by attempting to reopen his case and/or secure a lower sentence. This improper supervision of subordinates is what lead to these actions and will continue because the subordinates know there will be no consequences.

9. CAUSE OF ACTION: Deliberate indifference to medical needs against Mrs. SIMMS (nee MOCK), Dr. SWINDEL, Associate Warden BRAWLEY, Acting Warden BARLETT, Administrative Remedy Coordinator (FCI Loretto), Administrative

Remedy Coordinator (Northeast Region, BOP), Administrative Remedy
Coordinator (BOP Central Office).

A.    MARSHALL was seen by an outside sleep apnea specialist. The results
of this sleep study are in MARSHALL's medical records. It was
determined that MARSHALL required a CPAP machine. One was given
to him. During transfer from GEO RCI to FCI Loretto, the machine
accompanied MARSHALL on his person. Upon arriving at FCI Loretto
in February 2021, the machine was taken by SIMMS. MARSHALL believed
this was to have it checked out and then returned. The machine
was never returned to MARSHALL. Some time after, MARSHALL mentioned
this to SIMMS and Dr. SWINDEL. After more time, MARSHALL wrote
up this issue in an administrative remedy along with all the other
issues discussed herein in an effort to obtain Compassionate Release/
Reduction in Sentence. This was sent to Acting Warden BARLETT
and was denied. MARSHALL appealed this to the Northeast Regional
Director and then to the Central Office in Washington, DC, claiming
each time that the individuals showed deliberate indifference
to MARSHALL's medical needs. Not one person whom MARSHALL appealed
to had the compassion or drive to make a phone call to the medical
staff at FCI Loretto and request that MARSHALL's CPAP machine
be returned to him. Despite this, SENTRY data in the BOP's computer
system shows that MARSHALL is a CPAP inmate. Therefore, as far
as data is concerned the BOP is fraudulently claiming that MARSHALL
has a CPAP in his possession while, instead, he is suffering daily
from lack of sleep, headaches, slight signs of memory loss and
absentmindedness, and fatigue. He is at a higher risk of heart
disease every day that passes. The Defendants have a duty to care
for MARSHALL and/or make sure he is being cared for. They are not.

Note: Although the Magistrate would not grant MARSHALL the permission
to bring Officer HILDEBRANT, who at times has been retaliating
against MARSHALL, and who has thrown away over half of MARSHALL's
property, MARSHALL mentions this for the record in case things
both legal and personal go too far, because this particular officer
has tried to encourage other inmates to go against MARSHALL at
times in the past.

## VIII. CONCLUSION

53. The factual allegations of the complaint shall be taken as true for the
purpose of this screening. The Court need not wait for MARSHALL to have a major
heart attack or other worsened condition to warrant relief when it can be remedied
and possibly stopped before MARSHALL, or any other inmate, loses his life to
the hands of the BOP's negligent care of the inmates in their charge.

## IX.  RELIEF

54. Based on the aforementioned facts, claims and averments, the Plaintiff initially
seeks a motion for Compassionate Release/Reduction in Sentence from the BOP,
and the $25,000 in connection with the interference of the suit against Peidmont
Regional Jail.

55.  If the Defendants will not accept those terms, the Plaintiff moves for a)
compensatory damages in excess of $25,000 from each Defendant liable in his or
her individual capacity for the physical pain and cruel and unusual suffering
the Plaintiff had to endure and continues to endure; b) punitive damages in the
amount of $100,000 from each Defendant in his or her individual capacity to deter
future misconduct; c) compensatory damages in the amount of $250,000 from the
United States of America for all claims arising under the Federal Tort Claims
Act; and d) all other damages that this Honorable Court can reasonably award.

## DOCUMENTS/EVIDENCE

That will be presented in support of the claims

1) Medical records concerning the sleep study

2) Administrative remedies; GEO level

3) Administrative remedies; BOP

4) Compassionate release request to BOP

5) RHU Commissary slip; GEO

6) Commissary receipt; GEO

7) Memorandum to Inmate Population (TRULINCS)

8) Study concerning Obstructive Sleep Apnea's toll on the heart

9) Tort Claim; Office of General Counsel

10) RCI Inmate Handbook concerning BOP authority of torts over that of private facilities

11) RCI Handbook concerning the responsibilities of case managers and counselors

12) Evidence of suit concerning Peidmont Regional Jail

13) Property slip of November 17, 2020

14) Medical records of bacterial infection

If necessary, Plaintiff will file a motion for discovery for all other documents that may be needed at a later time, and will acquire other forms of evidence from medical staff as needed.

## SERVICE

Being an inmate, MARSHALL is not privy to the names and addresses mentioned in this suit and asks that all Defendants be served by means of this Court.

I, DARAYA MARSHALL, do declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability purusuant to 28 USC § 1746.


May 16, 2025

_____

Daraya Marshall
Pro se, in forma pauperis
FCI Loretto
PO Box 1000
Cresson, PA 16630

## SERVICE

Being an inmate, MARSHALL is not privy to the names and addresses mentioned in this suit and asks that all Defendants be served by means of this Court.

I, DARAYA MARSHALL, do declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability purusuant to 28 USC § 1746.

May 16, 2025

Daraya Marshall
Pro se, in forma pauperis
FCI Loretto
PO Box 1000
Cresson, PA 16630